IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| KASSIDY WOODS, § § § Plaintiff, § § v. § § NICHOLAS ROLOVICH, in his § individual capacity, and § WASHINGTON STATE UNIVERSITY, § § Defendants. § | Cause No.: _____ |

## ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

COMES NOW Kassidy Woods ("Woods") as Plaintiff and states the following causes of action against Defendants Nicholas Rolovich ("Rolovich"), in his individual capacity, and Washington State University ("WSU") (hereinafter collectively referred to as "Defendants"). This lawsuit arises pursuant to 42 U.S.C. § 1983 and seeks damages to remedy violations of rights secured by First Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and Title VI of the Civil Rights Act of 1964.

# I.
# PARTIES

1. Plaintiff Kassidy Woods is a resident of the State of Texas.

2. Defendant Nicholas Rolovich is a resident of the State of Washington. At all times relevant herein, Rolovich served as the head football coach for WSU. In that position, Rolovich serves as one of the highest paid government employees of the State of Washington. Rolovich may be served through the Washington Attorney General's Office, 332 French Administration Bldg., Pullman, WA 99164.

3. Defendant Washington State University is a public university located in the State of Washington. WSU may be served through the Washington Attorney General's Office, 332 French Administration Bldg., Pullman, WA 99164.

4. For all acts complained of herein, Defendants acted under color of state law.

# II.
# JURISDICTION AND VENUE

5. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1332, and 1343; 42 U.S.C. §§ 1983 and 1988; 42 U.S.C. § 2000d; and common law. Supplemental jurisdiction over the pendant state law claims is proper pursuant to 28 U.S.C. § 1367(a) and common law.

6. This Court may exercise personal jurisdiction over Defendants as a significant amount of the activity complained of herein was conducted by Defendants in the State of Texas, was directed by Defendants to the State of Texas, and arose from a contractual agreement directed by Defendants to the State of Texas and signed in the State of Texas. Additionally, Defendants required performance of Plaintiff in the State of Texas and elsewhere. Thus, Defendants have directed and performed acts within the State of Texas and have subjected themselves to the jurisdiction of this Court.

7. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) as the acts and omissions complained of herein originated from activity directed by Defendants in this judicial district.

### III.
### FACTUAL SUMMARY

**"It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."**

*NAACP v. Alabama*, 377 U.S. 288, 307 (1964).

8. Woods is a Black student-athlete who was a highly skilled football player at Greenhill High School in Dallas, Texas. Woods possesses rare qualities of size, speed, strength, coordination, "toughness," and mental ability necessary to be an elite athlete. These qualities identified Woods to college programs as a player who could compete at the highest level of college football.

9. While at Greenhill High School in Dallas, Texas, WSU began to recruit Woods to provide contract athletic services to WSU upon his high school graduation in May 2018. As Woods received similar recruitment from multiple NCAA FBS Division One programs, WSU's efforts to lure Woods to WSU were consistent and relentless.

10. Through its employees, including then-head coach Mike Leach, WSU made numerous trips to Dallas in 2017 to watch Woods play football and to talk with Woods about providing contract athletic services to WSU upon Woods' high school graduation. The WSU representatives traveled to Texas and to visit Woods' home, wherein Coach Leach and other WSU employees appealed to Woods and his parents regarding the benefits of providing contract athletic services to WSU. In November 2017, WSU provided an all-expense paid trip for Woods

and his parents to travel to Pullman, Washington to visit the WSU campus in an attempt to further convince Woods to contract with WSU to provide athletic services to WSU upon Woods' high school graduation.

11. Leading up to the NCAA National Signing Day for football athletes in December 2017, WSU sent Woods, who was living in Texas, two written contracts wherein WSU asked Woods to sign to provide athletic services to WSU. Those agreements included a National Letter of Intent ("NLI") and a financial agreement setting forth the financial consideration and benefits that WSU would pay to Woods for his athletic services. On National Signing Day, Woods accepted WSU's offer and signed the contract documents at a ceremony at his high school in Dallas, Texas.

12. After graduating from high school in May 2018, Woods traveled to Pullman, Washington pursuant to his contract with WSU.

13. Woods excelled as an athlete and student at WSU. On the football field, Woods quickly developed a strong relationship with Coach Mike Leach and other athletic and academic staff at WSU. In the 2019 football season, Woods played in twelve games. Heading into the 2020 season, Woods was in position to start for the team as a mere sophomore.

14. Woods was supported by the WSU athletic staff and his peers within the football team. Both in and out of the athletics department, Woods' leadership abilities were quickly realized: he co-founded the Black Student Association at WSU; he served as a representative on the WSU Student Athlete Advisory Committee; he represented WSU for the Pac-12 Conference Student Athlete Leadership Team; and acted as a student representative for the Division One Student Athlete Connection Group. Woods' leadership among his peers and at WSU was recognized to such extent that, in January 2020, WSU paid for Woods to travel to Austin, Texas

to represent WSU in the Black-Athlete Summit. There, Woods would discuss topics affecting Black athletes and universities with other student-athletes from across the country. At all times, Woods was in good academic standing with WSU and in full compliance with his contract for athletic services.

15. January 2020 saw unexpected change within the WSU football program, as head coach Mike Leach resigned from his position at WSU to take a position at Mississippi State University. In response, WSU hired Defendant Nicholas Rolovich, a White coach from the University of Hawaii, to replace Coach Leach. WSU reportedly pays Rolovich $3 million a year, making Rolovich one of the highest paid government employees in the state of Washington.

16. In March 2020, the COVID-19 pandemic spread into the United States at a rate that disrupted all sectors of business and education.

17. As an entirely unique and unprecedented health threat, COVID-19 came with information and opinions that were often contradictory and/or uncertain. WSU, like most universities, closed its campus and asked students and athletes to return to their homes. The virus interrupted the football calendar for WSU—initially through the cancellation of spring practices.

18. Like many FBS football programs facing the COVID-19 pandemic, WSU implemented home-based workout programs and virtual interaction processes for players and staff in an attempt to continue preparations for the 2020 football season and to comply with their athletic services contracts from the athletes' home states. For Woods, these continued services were performed in Texas.

19. In addition to virtual meetings via Zoom, the players were given access to Xos, an electronic film platform accessible through the internet for 24-hour access to practice and game film. The WSU football program additionally set up communication platforms with players

through a group messaging application called GroupMe. WSU Coach Andre Allen established group communications through text messaging for players to stay connected with each other and with coaches. These efforts were an made by the coaches to compel the athletes to continue performing their contractual commitments to WSU from their home states. Under the circumstances, the electronic interaction media allowed players to avoid physical interaction yet remain connected to the team.

20. In June 2020, the WSU coaching staff—under the direction of Coach Rolovich—directed virtual discussions via Zoom with players and their families regarding the eventual return to WSU and the anticipated fall football season. Specifically, for the purpose of this action, WSU directed these communications to Woods and his family in Texas.

21. On June 10, 2020, the WSU football coaches held a Zoom meeting with the student-athletes' parents. In attendance at this meeting were Rolovich, Athletic Director Pat Chun, team doctors, and a nutritionist. The purpose of the discussion was to address the protocol for the student-athletes' return to campus for the "voluntary" workouts. Paramount to Woods and his family was the representation made that "no one had tested positive" for COVID-19. The team did not discuss an option for players to opt out of participation in athletic events in light of the pandemic. Rather, WSU coaches and staff expected players to report back to campus on July 1, 2020, asserting that "campus was the safest place" for players.

22. The protocol for returning to WSU was that players were required to self-quarantine when they arrived at their summer residence. Based upon WSU's representations, Woods traveled from Texas to Washington on or about June 29, 2020 to participate in "voluntary" workouts pursuant to the protocol. Those conditions were particularly important to Woods and

his family, as Woods carries the sickle cell trait. This trait exposes Woods to heightened health risks in light of the COVID-19 virus.

23. Unfortunately, the promised environment of campus as the "safest place" for athletes was a complete fabrication by Defendants. Not only were athletes already testing positive for COVID-19 without notification to other players, Woods' own roommate had been exposed just two days prior to Woods' arrival on campus. Woods' roommate indicated to Woods that roughly ten football players had tested positive at that time. His roommate felt that Woods should know about the positive cases even though Defendants strictly ordered the players to keep silent to the media and others – including players who had not yet reported back to Pullman – regarding positive COVID-19 cases that were occurring within the program.

24. After arriving on campus, Woods and other FBS football players (both at WSU and at other Pac-12 universities) questioned teams' return to football in light of the health risks associated with exposure to COVID-19, the required waiver of liability by some university athletics programs for exposure to those health risks, and the lack of candor by athletic departments and coaches. This university nonchalance was likely driven by the enormous revenues generated by football athletes for the universities and coaches. It was also observed that Black athletes comprise a significant percentage of the university students asked to assume COVID-19 risks while performing athletic services, some required to sign COVID-19 waivers, for the financial gain of the universities. These concerns were particularly acute due to the less-than-represented environment of safety precautions that existed at WSU and other FBS universities.

25. The circumstances that Black athletes occurred in a time of heightened awareness of the treatment of Black Americans in several high-profile cases of police maltreatment and

brutality in the United States. A coalition of discussion between Black athletes formed around these ideas and questions. Ultimately, a group of Pac-12 athletes identified in a social and racial justice group by the name of "#WeAreUnited."

26. On or before July 20, 2020, Rolovich shared with the WSU athletes a post by 247Sports reporting on a "[g]roup of Pac-12 football players reportedly threatening to boycott season if demands aren't met." Rolovich's message to the athletes stated: "This is the first I've heard of this. If you are involved in this, you can always call me."

27. On July 23, 2020, Woods and another player met with Rolovich to discuss the #WeAreUnited movement, their concerns regarding the health risks associated with their athletic participation, and the apparent lack of any planning or testing, among other concerns specific to Black athletes. Rolovich responded that he would talk to other Pac-12 coaches about the issues.

28. On August 1, 2020, Woods and Rolovich had an additional conversation about COVID-19 and Woods' concerns for his own health. Woods told Rolovich that, due to his health concerns, he was going to opt out of the 2020 football season. To Woods' surprise, Rolovich responded not to Woods' health concerns, but by asking if Woods was a part of the #WeAreUnited group. This question surprised Woods because Woods and Rolovich had previously discussed #WeAreUnited and Woods' support for the goals of the organization. Nonetheless, Woods affirmed that he did identify with the group. In response, Rolovich told Woods:

> "OK so that's going to be, that's gonna be an issue if you align with them as far as future stuff, cause the COVID stuff is one thing . . . **But, um, joining this group is gonna put you on a, on a — that's obviously, you know, you get to keep your scholarship this year, but it — it's gonna be different.** You know, if you, if you say, 'I'm opting out 'cause of COVID and health and safety,' I'm good. But **this group is gonna change, uh, I guess, how things go in the future for everybody**, **at least at our school**." (emphasis added).

Rolovich then immediately instructed Woods to clean out his locker and told Woods that he could not be around the other players any longer. When Woods asked why, Rolovich responded that it would send "mixed messages to the team" if Woods were allowed to be around the team.

29. Rolovich's message was clear and unmistakable: If Woods was aligned with #WeAreUnited, then he was no longer part of the team and his future scholarships would be rescinded because that is the position of WSU on being part of the social and racial justice group.

30. The following morning, on August 2, 2020, WSU football coach Rafael Aguilar removed Woods and five other WSU players who had supported #WeAreUnited from the GroupMe messaging group. Immediately thereafter, Woods was also disconnected from Xos and was no longer sent links to participate in video conference meetings on Zoom with the other players on the team.

31. WSU would later allege that these "precautions" were taken for players who were sensitive to exposure to COVID-19. However, the fallacy of that argument is obvious; at the time of this Complaint, there are no reported cases that can be found of transmission of COVID-19 through Zoom, Xos, iMessage, or GroupMe chats. COVID-19 transmission is entirely impossible through virtual communications.

32. Defendants took blatant steps to remove Woods from the WSU football team and send a clear, chilling message to those remaining on the team: joining the #WeAreUnited movement results in complete removal, ostracism, and isolation. Rolovich alluded to this fact in his telephone conversation with Woods and implemented these exact goals.

33. Rolovich would later deny his August 1, 2020 words to Woods. Unbeknownst to Rolovich, Woods recorded his conversation with Rolovich to ensure that Woods' version of the events—the truth—was supported.

34. Woods and his family were left to wonder what would happen to Woods since he had been removed from the team in every aspect. Woods reached out to WSU Athletic Director Pat Chun and asked for a conversation so he could try to understand where he stood with the team. Pat Chun informed Woods that he agreed with the position adopted by Rolovich.

35. Furthermore, since campus was closed at this time to everyone but the athletes, there were no options available to Woods to even receive meals normally provided to players during the pre-season period as part of the contract for athletic services.

36. Woods' family made a statement to the media regarding Woods' removal from the team for his opting out of the season. That statement was widely disseminated on social media and national television.

37. In response to the social media activity surrounding #WeAreUnited, Rolovich issued an internal statement to the WSU athletes instructing them not to discuss opting out on social media, and not to support those who do either explicitly or by "re-posting" an opt-out message or support for the #WeAreUnited movement.

38. Rolovich's message is clear and further demonstrates Defendants' actions under the color of state law to chill public discourse on matters of social and racial justice. To Defendants, if a player is on social media and posts regarding players who have opted out, or is supportive of #WeAreUnited and then opts out of playing for any reason, that player's athletic services contract funds will be terminated unless that player expressly and publicly takes a stance in opposition of the #WeAreUnited movement.

39. In an apparent response to the heightened awareness of WSU's COVID-19 issues within the athletics department, WSU released COVID-19 opt out protocols on August 3, 2020.

This release was the first formal policy distributed by WSU regarding COVID-19 and the players' ability to opt out.

40. On August 5, 2020, counsel for Woods sent a letter to WSU, Rolovich, Pat Chun, and the Office of the Attorney General in which it requested a Zoom meeting to discuss Woods' relationship with the team and Rolovich's actions in terminating Woods' access to the program, including his access to meals. This letter went ignored.

41. On August 6, 2020, another WSU football player tested positive for COVID-19. Practices were cancelled and WSU specifically instructed the players not to inform the media about the team's positive tests. Perhaps, concealing reality was an inconvenience to the economic opportunities presented by holding a normal football season for Defendants' benefit and to the potential detriment of the WSU athletes.

42. On August 7, 2020, 247Sports interviewed WSU President Kirk Schulz regarding the Woods situation. Schulz reiterated that Woods "is an exceptional young man" and acknowledged that WSU had not adequately communicating to the circumstances surrounding the pandemic to its students. Schulz said that the issue "was blown out of proportion" but that he would be talking with Woods. In an interview of Rolovich, Rolovich claimed that his own words were "misconstrued."

43. Attorneys for Woods continued to press WSU for answers and a Zoom meeting with Schulz, Chun, and Rolovich. Finally, a Zoom meeting was set for August 13, 2020. However, only Chun and an attorney from the Attorney General's office participated. That meeting is best described as perfunctory.

44. Pat Chun is the Athletic Director for WSU and the highest-ranking official of the WSU Athletic Department. In that role, Chun is responsible for establishing all policies affecting

the athletic programs at WSU and is the final decision maker for all athletic programs, policies, and procedures at WSU. Rolovich reports directly to Chun.

45. During the August 13, 2020 Zoom conference call, Chun often appeared bored while the Woods family explained their frustration and concern regarding basic issues such as Woods' ability to obtain meals while on campus. Chun expressed that WSU's stance in support of Rolovich was entrenched and unwavering. As for Schulz's media statement that he would personally talk to Woods, that never occurred despite numerous attempts by representation from Woods and his family to do so.

46. Understanding that his career at WSU had been terminated by Defendants, Woods entered the NCAA transfer portal. He sought to find a university that would support the concerns of players, like himself, who believe that treatment of Black student-athletes deserves a conversation that is protectable speech and assembly, including protections for athlete health and safety in a pandemic, without government retaliation.

47. Woods' concerns were justified. On September 11, 2020, Pat Chun at last acknowledged what the WSU athletes already knew: In just the small window of time that athletes had been on campus, **sixty** tested positive for COVID-19. These cases occurred during the time that WSU was ordering athletes to conceal the truth or otherwise face retaliation, and to abstain from support of the #WeAreUnited movement that questioned this very activity and demanded change.

48. After entering the transfer portal, Woods was notified almost immediately by WSU that his contract for athletic services would be prematurely terminated at the end of the fall semester.

# IV.
# CAUSES OF ACTION

### Count One:
### VIOLATIONS OF FREEDOM OF ASSOCIATION RIGHTS SECURED BY THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

49. The preceding paragraphs are incorporated by reference herein.

50. The First Amendment to the United States Constitution holds that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble." U.S. Const. amend. I.

51. All of the actions taken by Rolovich or those acting on behalf of Rolovich and referred to herein, including the termination of Woods from the WSU football team and related indication that his contract for athletic services would not be renewed, were performed by Rolovich while acting under color of state law and had the effect of depriving Woods of rights secured by the Constitution and laws of the United States. Specifically, Woods' Freedom of Association rights secured by the First Amendment were violated by Defendants' retaliatory remarks upon Woods' mere association with the #WeAreUnited group.

52. The treatment that Woods received and the acts by Rolovich were in direct retaliation for the exercise of civil rights secured by the Free Association protected afforded by the First Amendment to the United States Constitution.

53. Rolovich's acts were racist, intentional, malicious, willful, wanton, and in gross and reckless disregard of Woods' constitutional rights.

54. Rolovich's acts damaged Woods in an amount to be proven at trial.

55. Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of a State . . . subjects, or causes to be subjected, any citizen of the

United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." Therefore, both Defendants—Rolovich and WSU—are liable to Woods on this cause of action for deprivation of Woods' Freedom of Association rights secured by the First Amendment as both Defendants unconstitutionally restricted Woods' freedom to associate with the #WeAreUnited group.

## Count Two:
## VIOLATIONS OF RIGHTS SECURED BY THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

56. The preceding paragraphs are incorporated herein by reference.

57. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

58. Woods is a member of a suspect class and was unlawfully discriminated against due to his race and association with others in peaceable assembly for the protection of Black collegiate athletes and others affected by racial discrimination.

59. Rolovich discharged Woods from the WSU football team because of his race, association with other Black athletes, and desire to impact racial justice in the United States.

60. Rolovich's acts damaged Woods in an amount to be proven at trial.

61. Pursuant to 42 U.S.C. § 1983, both Defendants are liable to Woods for this constitutional deprivation as both Defendants participated in the denial of Woods' Equal Protection rights afforded by the Fourteenth Amendment.

## Count Three:
## BREACH OF CONTRACT
## (Against Defendant Washington State University only)

62. The preceding paragraphs are incorporated herein by reference.

63. Woods and WSU entered into a binding agreement requiring Woods to provide athletic services to WSU in exchange for certain benefits, including housing, food, and cash allowances.

64. Woods at all times performed his obligations under the contract for athletic services.

65. At the direction of Rolovich and with the support of Pat Chun, WSU breached the contract by failing and refusing to perform, including, but not limited to, failing to provide safe housing, food, and other basic requirements to Woods. WSU then terminated the agreement prematurely.

66. Due to the breach by WSU, Woods was damaged in an amount to be proven at trial.

### Count Four:
### TITLE VI OF THE CIVIL RIGHTS ACT OF 1964
### (Against Defendant Washington State University only)

67. The preceding paragraphs are incorporated herein by reference.

68. Title VI of the Civil Rights Act of 1964 holds that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000e (1964).

69. WSU excluded Woods from participating in and receiving the benefits of the athletics program at WSU. This discrimination was on the basis of Woods' race, as the #WeAreUnited movement sought to remedy racial injustices.

70. WSU is a public university that receives federal financial assistance.

71. Due to this unconstitutional restriction by WSU, Woods was damaged in an amount to be proven at trial.

## V.
## CONDITIONS PRECEDENT

72. All conditions precedent to the rights and claims herein either have been performed, have occurred, or have been waived.

## VI.
## PUNITIVE DAMAGES

73. The acts by Defendants were intentional and committed with reckless or callous disregard of Woods' rights. Woods seeks punitive damages consistent with the reprehensibility of Defendants' conduct and to deter repeated similar conduct by Defendants in the future.

## VII.
## ACTUAL DAMAGES

74. Woods seeks actual damages for the harm to his athletic career, lost scholarships, and lost educational opportunities as a result of Defendants' unlawful conduct. These damages are sought in an amount to be determined at trial.

## VIII.
## EXPECTATION DAMAGES

75. Woods seeks damages for his restricted access to university housing, food, and other allowances outlined in his athletic services contract due to Defendants' unconstitutional and unlawful behavior. These damages are sought in an amount to be proven at trial.

## IX.
## ATTORNEYS' FEES

76. Woods seeks attorney fees in an amount to be proven pursuant to the Civil Rights Attorney's Fees Awards Act and as allowed under state and federal law.

## VII.
## JURY DEMAND

77. Woods demands a trial by jury.

## **PRAYER**

WHEREFORE, Plaintiff Kassidy Woods prays and requests the Court find:

a. In favor of Woods and against Defendants on all claims;

b. In favor of Woods for all actual damages;

c. That Woods be awarded reasonable attorneys' fees;

d. That Woods be awarded punitive damages in an amount to deter future similar and unlawful conduct by Defendants; and,

e. For such other and further relief as the Court may deem just and equitable.

Respectfully submitted,

*/s/ Cody L. Towns*
Cody L. Towns
Texas Bar No. 24034713
**TOWNS LAW FIRM, P.C.**
4835 LBJ Freeway, Suite 750
Dallas, Texas 75244
(469) 421-1500 Telephone
(469) 421-1505 Facsimile
E-mail: ctowns@townslawfirm.com

**ATTORNEYS FOR PLAINTIFF**